## Case No. 10,851.

### The PAWASHICK.

[2 Lowell, 142; 7 Am. Law Rev. 361.] [1]

District Court, D. Massachusetts. Sept., 1872.

EVIDENCE—FOREIGN LAWS — SEAMEN'S WAGES — SUITS BETWEEN FOREIGNERS.

1. In this court the law of England may be proved by printed books of statutes, reports, and text-writers, as well as by the sworn testimony of experts. Some cases on this point examined.

[Quoted in Dundee Mortgage & Trust Investment Co. v. Cooper, 26 Fed. 668.]

2. Attention is called to St. 24 Vict. c. 11, which authorizes and suggests that treaties should be made for facilitating the proof of the foreign law reciprocally, in the countries of the contracting parties.

3. A British shipmaster may proceed in this court for his wages against the British ship in which he served: The Havana [Case No. 6,226], followed.

[Cited in Whitney v. The Mary Gratwick, Case No. 17,591.]

4. The court will take jurisdiction of such a suit between foreigners, if the voyage is ended, and there is no contract binding the parties to another jurisdiction, and no reason given why justice cannot be done here.

[Cited in The Belgenland, 114 U. S. 364, 5 Sup. Ct. 864.]

Libel in rem, by Charles Finch, late master of the British bark Pawashick, of Summerside, Prince Edward's Island, for wages. The libellant and the claimant both lived at Summerside. The contract between the parties was as follows: "Captain Charles Finch agrees to take charge of bark Pawashick, for the sum of nine pounds sterling per month, from this date, and Robert T. Holman, the owner, agrees to pay that sum. Summerside, P. E. I., Sept. 6, 1870."

The vessel made several voyages under the libellant's command, and arrived at Liverpool in December, 1871, needing repairs, which detained her there for more than three months. The correspondence between the parties during this time, and the other proofs, tended to show that the owner wished to have a master who had received the certificate required for the commanders of mer-

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission. 7 Am. Law Rev. 361, contains only a partial report.]

chant vessels in certain trades by the law of the flag; that the libellant had no certificate, and did not choose to apply for one; that no fault was found with his skill or conduct; that he was displaced by the agent of the ship on the 12th of February, 1872, and his wages were paid in full to that time; that the vessel was ready to sail from Liverpool early in April, and Finch then proceeded in the admiralty for an alleged balance of £48. 10s. It was thereupon agreed in writing that he should receive £20, and a free passage home in the bark, and discontinue the suit, and settle with the owner at Summerside. The money was paid, but the libellant preferred to come home in a different vessel, in which he engaged as second mate.

C. T. Russell, for claimant, contended, that no evidence had been introduced of the laws of England, which must, therefore, be presumed to be like our own, by which a master could not proceed in rem. If the court felt at liberty to examine the merchant shipping act, and the decision of Judge Sprague in The Havana [supra], he should contend that the reasoning in that case was not sustained by the later cases in the supreme court, which refuse to recognize statute liens. (2) The court will not take jurisdiction of this case. It does not come within any of the exceptions mentioned in The Becherdass Ambaidass [Case No. 1,203]. (3) The libellant has waived his lien, if he ever had one. The William Money, 2 Hagg. Adm. 136; The Bolivar [Case No. 1,609]; The John Lowe [Id. 7,356]; Packard v. The Louisa [Id. 10,652]; Leland v. The Medora [Id. 8,237].

C. G. Thomas, for libellant, relied on The Havana [supra].

LOWELL, District Judge. In the admiralty, as in other courts, foreign law must be pleaded and proved, as a fact. Talbot v. Seeman, 1 Cranch [5 U. S.] 1; The Prince George, 4 Moore, P. C. 21; The Peerless, Lush. 40; Le Louis, 2 Dod. 241. The various modes in which such proof shall or may be made have been much discussed, especially in the United States, which are judicially treated as foreign to each other. The following text-books contain a reference to the decisions on this subject, some of which I shall have occasion to cite hereafter. Story. Confl. Law, § 641; Whart. Confl. Laws, § 771; Greenl. Ev. § 486, &c.; Bish. Mar. & Div. (4th Ed.) c. 23. But, first, I may observe that, upon the question of the master's lien, the case of The Havana is a precedent for my guidance. It has been ruled, indeed, in England, though without argument, that in the courts of that country the law of Scotland must be proved anew in each case: McCormick v. Garnett, 5 De Gex. M. & G. 278; and this is approved by Mr. Westlake, Private International Law (section 413), who says it would be entirely unsafe to refer to the proof in some preceding English case, be-

cause the foreign law may have been changed in the interval. But I find it more consistent with reason and analogy to presume the law to remain constant, until a change is proved, as in case of a local custom, which, proved in one case by a verdict and judgment, is taken to be true thereafter in that jurisdiction. It may be said that a local custom within the realm is the law of the realm, of which the courts will take notice, after they have once been judicially informed of it, while the foreign law is a fact as to which testimony may differ. But how can it be said that Judge Sprague's decision, that a British ship may be proceeded against by her master in this court for wages is not a decision of law, of which I am to take judicial notice, though its foundation may, in part, be a matter of fact? Lord Stowell, in Dalrymple v. Dalrymple, 2 Hagg. Consist. 54, 81, in enumerating the authorities he should cite to prove the law of Scotland, mentioned, first, "the opinions of learned professors given in the present or similar cases." And he quoted opinions given in a case which was tried more than twenty years earlier than the one then in judgment.

This case, however, will require some examination of the law of Great Britain besides that of the master's privilege against the ship, some other sections of the merchant shipping act and their received interpretation, and I have, therefore, inquired whether I can receive in evidence the books of admitted authority, or must rely wholly on the sworn testimony of experts. Here, again, we find, in the case last cited, the eminent judge making reference to books of authority, and to adjudications of the Scottish courts. This celebrated opinion, from which extracts are made in several text-books, has been criticised by Lord Brougham as being in its method ultra vires, when it steps beyond the sworn evidence, and undertakes to discover and reason on the law of Scotland. Tayl. Ev. § 1280, note. Mr. Taylor and other writers appear to agree with the dictum, that the foreign law, written or unwritten, must always be proved by an expert. 1 Rosc. N. P. Ev. (13th Ed.) 138; 2 Phil. Ev. (4th Am. Ed.) 428. Mr. Westlake (section 414) points out that this criticism rests on dicta, rather than decisions. The cases that are supposed to have decided it are Baron de Bode's Case, 8 Q. B. 208. 246; Sussex Peerage Case, 11 Clark & F. 85, 114. What these cases actually decided was, that a scientific witness may testify to the written foreign law, with or without the text of the law before him, the value of the evidence resting in the soundness of his opinion, and the court not being supposed competent to criticise it by any comparison with the books. Before these cases, the law permitted codes or statutes to be proved by copies, authenticated to the reasonable satisfaction of the court, but was not supposed to require the aid of an expert in all cases. The rule was usually stat-

ed as in Story, Confl. Law, §§ 640–642, that foreign written laws are proved by copies (giving various modes in which the cop'es may be verified), and unwritten laws by the testimony of skilled witnesses. The great stress laid, by the majority of the learned judges in Baron de Bode's Case, upon the comparative value of the opinion of a skilled witness, and of the mere text of a code, has led, I suppose, to the adoption by text-writers of the sweeping generalization above mentioned. With deference to their opinion, I think Mr. Westlake's caution more safe; for the reasoning by which the opinion of the expert was exalted, and the illustrations made use of by the court, go very far to show that they would admit books of authority as well as sworn experts. Thus Lord Denman (page 253) quotes with approbation, and as part of his reasoning, the language of Lord Ellenborough in Picton's Case, 30 How. State Tr. 225, 491, that "text-writers furnish us with their statement of the law. and that would certainly be good evidence upon the same principle which renders histories admissible." And he adds: "A person states that the law is in a book; and a witness, having said that such book is considered of authority, it is received at once as evidence of the law in question." And again, "In questions of foreign law, books of the highest authority must frequently be resorted to: Pothier's works, for instance, as to the law of France upon contracts, bills of exchange, policies of insurance, and so on" (page 254). The point to be decided being that an expert might state the result, the actual state of the law, without producing the codes, &c., the parallel of text-books which state such results was brought up. This argument hardly seems to countenance the doctrine that books are never to be received.

Lord Stowell, in Dalrymple v. Dalrymple, ubi supra, after mentioning as the first source of information of the foreign law the opinions of learned professors, adds, "secondly, the opinions of eminent writers, as delivered in books of great legal credit and weight; and, thirdly, the certified adjudications of the tribunals of Scotland upon these subjects. I need not say that the last class stands highest in point of authority."

I believe the rule thus announced is the true rule for this court in respect to the English law. I say this with a full knowledge of the criticisms that have been made upon it; and I will proceed to give my reasons for that opinion. The relations which we hold to England in the common origin of our laws, a similar mode of legal reasoning, the habit of studying and citing the English cases, the common language and frequent intercourse between the two countries, render it safe and proper to adopt a similar practice with respect to the laws of that country that the states of this Union have generally found it expedient to carry out in relation to each other. It was soon found,

in trials in the United States, that the danger of mistaking the laws of the other states was, on the whole, a less evil than the danger of injustice and delay, if the strict proof were required in every case. In consequence of this discovery, many of the states have passed laws admitting the printed statutes and books of reports of the sister states to be read in evidence. See Story, Confl. Laws (Redf. Ed.) § 641a. But before these statutes were passed, or without their aid, the courts of some states have taken this step for themselves. Thompson v. Musser, 1 Dall. [1 U. S.] 458; Raynham v. Canton, 3 Pick. 293; Young v. Templeton, 4 La Ann. 254; Lord v. Staples, 3 Fost. [23 N. H.] 448. In two of these cases a query was made whether foreign statutes, strictly so called, could be proved by printed copies only, even with evidence tending to show the authenticity of the copies. But such statutes have been received in two cases, in which it was merely proved that they were bought of the public printer (Jones v. Maffet, 5 Serg. & R. 523; U. S. v. Certain Casks of Glassware [Case No. 14,764]); in another, because the code had been promulgated by the executive department of our government as authentic (Talbot v. Seeman, 1 Cranch [5 U. S.] 1); in another, because the copy had been sent to the supreme court of the United States by authority of a foreign government (Ennis v. Smith, 14 How. [55 U. S.] 400). In that case it was said, as the ratio decidendi, that foreign written law may be received when it is found in a statute book, with proof that the book has been officially published by the government which made the law. This does not exhaust the list of cases, nor the actual or possible modes of authentication. The only rule to be made out of the late American cases is, that the copy of the statute must be shown, to the reasonable satisfaction of the court, to be genuine. Now we all know, and it is virtually admitted in this case, as I understand the argument, that we are fully as well able to verify the printed copies of the merchant shipping act, as any expert could be. In U. S. v. Certain Casks of Glassware [supra]. Judge Betts said he should have received the statute without the oath which proved it to have been bought of the queen's printer. The law is a progressive science, and, if printed books have superseded manuscripts, and are cited instead of certified copies, we may as well acknowledge the fact, and act accordingly. Between the doctrine, which has never obtained in America, if it does anywhere, that there must always be a sworn expert. and one which shall admit printed books of known authority to prove foreign statutes, I see no safe middle ground.

I believe it to be the true doctrine that the unwritten law of England may be proved in this court, not by experts only, but also by text-writers of authority, and by the

printed reports of adjudged cases; and that the written law may be proved by the printed copies, and be construed with the aid of text-books as well as of experts. Conscious as I am of my liability, and that of the bar, to mistake the foreign law, if we rely on books alone, ready as we shall always be to receive instruction from scientific witnesses, yet I cannot but see the great delays, misunderstandings, and difficulties which attend any rigid exclusion of books in all cases. We are obliged by the present state of the law to look to such aids for determining the actual law of all the states of this Union, and the danger of mistaking the laws of England is the same in kind as that which affects an ascertainment of the laws of New York or Wisconsin, and less in degree than we may apprehend in dealing with those of Louisiana, or any state the base and origin of whose jurisprudence is wholly different from ours. Indeed, in this court I am bound to take judicial notice of all those laws, and, on principle, this must exclude the testimony of experts, which puts me at a much greater disadvantage than if I merely should admit the books subject to explanation and correction.

It is singular how little direct authority there is on either side of the proposition that English law-books may be read in our courts as evidence of English law. A great many cases are decided here every year which involve some points of that law; and I suppose the parties usually agree, either expressly or tacitly, that the books may be read. For instance, Roberts v. Knights, 7 Allen, 449, turned on the construction of the merchant shipping act, and the report shows that the law was not proved by witnesses. The Maggie Hammond, 9 Wall. [76 U. S.] 435, decides points of English law which were not proved. In Carnegie v. Morrison, 2 Metc. [Mass.] 381, 404, Shaw, C. J., intimates an opinion that our relation to the English unwritten law is such that perhaps we need not rely on experts to prove it. It is plain, from a careful perusal of the whole passage, that he was prepared to control the opinion of very eminent experts by his own examination of what he rightly calls the authorities usually cited; that is, the reports of adjudged cases. In Ennis v. Smith, 14 How. [55 U. S.] 400, Wayne, J., delivering the opinion of the court, cites with apparent approbation a part of the same statement by Lord Ellenborough that was cited by one of the judges in Baron de Bode's Case, as above shown; namely, that the books of approved text-writers would certainly be admitted as evidence. I have seen no case in which it has been expressly decided that the common law of England must in all cases be proved by experts in the courts of America. I have cited some intimations and dicta to the contrary. The reason of the case seems to me to be that we should have the same liberal rule as has

generally, though not universally, obtained with respect to the laws of the other states of this government. Again, I do not see how it would be possible, under the American practice, to reject certified copies of the decisions of English courts; and, if not, we come back to the question, whether an idle and unnecessary and obsolete mode of verification shall be insisted on. In respect to the laws of France, Germany, or Russia, or any other country which has a wholly different system from our own, I should be inclined to say that the rigid rule might be better; but I am dealing now only with the laws of England, and wish to be so understood. And I hold that those laws may be proved by such books as aforesaid, as well as by the testimony of experts.

Again, there is authority for the proposition that a court of admiralty may exercise greater liberality in such matters than other courts. Dr. Lushington, in 1860, having the decisions of the queen's bench and house of lords in mind, as his remarks plainly show, explained and defended the practice of his court in waiving in fit instances strict technical proof by experts; and he admitted a printed copy of a statute coming from quasi official custody as evidence of the law of India: The Peerless, Lush. 30, 40. It may be added that the admiralty has, or at least uses, somewhat greater control over the conduct of causes than is usual in other courts. It may decline jurisdiction in some cases, or it may require further proof when necessary, and, in short, may adapt its practice to the exigencies of each case.

In The Maggie Hammond, 9 Wall. [76 U. S.] 452, Clifford, J., delivering the judgment of the court, appears to adopt for courts of admiralty a liberal rule; for he cites from Bell's Commentaries, to show that maritime law partakes of an international character, and that in all discussions respecting the same in the courts of Scotland the continental collections and treatises on the subject are received as authority.

I do not, however, feel compelled in this case to rely on any peculiar practice in the admiralty, for I consider that the better rule is that in the federal courts here, while the English law is undoubtedly to be pleaded and proved, yet evidence is competent which consists only of books of acknowledged or ascertained authority, and that, to prove that authority, an oath is not necessary in all cases. The proposition that Abbott on Shipping, and the regular reports of decisions of the courts, and the various books cited as authority for the law in England, cannot be read for this purpose here, appears to me little less than absurd.

There are, of course, a great many nice and intricate points of English law on which a court of this country would be unwilling to pronounce, with no aid but from books of authority. Such points are not, perhaps, so likely to arise in the admiralty as in some

other courts; and, when they do, a court of admiralty can, as I have intimated, take means to obtain instruction. Unfortunately, too, it is conceivable that experts may differ in opinion. No single strict rule is adequate to insure correctness on all occasions. In respect to cases of delicacy and importance, I would call attention to the act 24 Vict. c. 11, which gives power to the courts, when they have before them a suit which involves the law of a foreign country, to cause a statement of the facts or special case to be prepared and submitted to one of the courts of that country for the decision and certificate of the foreign law; and so, reciprocally, of questions arising in other countries involving the law of England.. This statute is in the nature of a proposition to other governments, and is to take effect only when treaties shall have been made providing for its operation. But it seems to me to embody a very useful suggestion; and I hope our government will consider whether it may not be adopted to advantage.

The claimant further objects that the master's privilege against the ship cannot be enforced in our courts. Judge Sprague's opinion in the case cited was that such a lien was not merely a remedy to be enforced in the domestic forum, but that it created a right in the thing which any court of admiralty could give effect to. I see no reason to re-examine that opinion. It is true, as was argued, that the supreme court, after Judge Sprague's decision was made, showed a disinclination to enforce the laws of the states giving liens for building and repairing ships, and changed the twelfth admiralty rule in that sense. But this action was explained in The St. Lawrence, 1 Black [66 U. S.] 522, and The Potomac, 2 Black [67 U. S.] 58, as being founded on expediency, and not on any doubt of the jurisdiction; and at the last term of that court, the rule has again been modified, so that the district courts now have jurisdiction of all admiralty liens, whatever their origin; and 'the decision in The Havana has been approved, and its reasoning has been followed and expanded, by Clifford, J., delivering the opinion of the supreme court in The Maggie Hammond, 9 Wall. [76 U. S.] 450.

This court, then, has jurisdiction, though it is not bound to exercise it in circumstances of hardship to the defendant, or any others which make it more expedient to remit the parties to the home tribunals. I examined the law of this subject with some care in The Becherdass Ambaidass [Case No. 1,203]. Without attempting, in that case, to lay down any general rule, I mentioned some cases in which jurisdiction had usually been taken. Among them were cases like The Havana, in which the voyage ended, or was broken up, within this jurisdiction. This case is not without analogy to those; because, though the voyage did not end here, it was ended before the parties came here: so that there was no allegation on either side of a continu-

ing connection or contract between the parties; and it resembles any other case in which two British subjects are in court, one of whom asserts the right to proceed against the vessel of the other. By one section of the merchant shipping act, seamen who have engaged for a voyage ending at home are not to sue for their wages abroad: that means, of course, while the voyage is yet unfinished, not that, months or years afterwards, if wages are still due them, they may not sue wherever they can find jurisdiction., I cite this merely by way of illustration of the most usual cases in which the courts have remitted parties to their home. It has been when they have seen that they were prima facie bound to proceed and finish a voyage, but undertook to ask a foreign court to relieve them of that duty. Thus, in the case above cited, I was asked to say that a foreign contract, which required the libellants to finish a voyage, was void by the foreign law; not that its terms had been broken, not that there was cruelty, misconduct, or even deviation, on the master's part; but I was called on to annul a contract which appeared to be reasonable, and to be in the course of proper fulfilment, on the mere ground of an insufficient description of the voyage to comply with a real or supposed statute of obligation. That I refused to do.

In this case, there is evidence that the libellant arrested the ship, or at least extracted a monition in a proceeding against her, in England; that there he was paid £20, and agreed to discharge that proceeding and settle his dispute with the owner at their common home. It is argued that this agreement is to be construed as a definitive and perpetual release of the ship, and an undertaking to settle by some other form of action, if suit should become necessary. I do not so read the paper. It seems to be merely a discharge of that suit, remitting both parties to all their former rights. The mention of home means that the libellant will forbear all further action of any kind in England, and until he has an opportunity to meet the owner at home. And it appears that the parties met at home, and failed to settle this controversy. The libellant thereafter had all rights and remedies he had ever had for any balance that might be due him after crediting the £20. If this suit were vexatious, that the libellant, having ample opportunity, omitted to sue at home, with the hope of extorting a settlement by arresting the vessel here,—which has been suggested, indeed, but not proved,—or any other evidence of vexation or oppression, I should hold my hand; but, the case being bare of any such facts, I take jurisdiction.

The title of the libellant to relief on the merits of his case is not so plain. His engagement was for an indefinite time, at so much a month. The master is not a ward of the admiralty in the same sense as the seamen. His contract is construed very differ-

ently, and much more like any ordinary agreement of agency. Thus it is held in England that his wages do not depend on the earning of freight, and it is said that they may be insured: Hawkins v. Twizell, 5 El. & Bl. 883.

Under a contract of this sort for an indefinite time, either party may end it on reasonable notice to the other, at least when no voyage is in progress; and in such a port as Liverpool, where, on the one hand, employment may be obtained, and, on the other, a master can be readily found, I do not know that any notice would be necessary. Curt. on Merch. Seam. 165; 3 Kent, Comm. 161; The Crusader [Case No. 3,456]. In this case, the libellant had notice that the owner wished to obtain a master who had a certificate; and the libellant did not care to apply for a certificate,—which would be good cause for his removal, if cause were necessary. If it be said that, by analogy to other seamen discharged abroad, the master is entitled to a passage home, that was offered him, and declined. I do not fully understand how the board in Liverpool comes to be charged; for, when the libellant rendered his account in his own way on the 21st of December, he charged merely his wages; and, again, he gave a receipt in full for his wages to the 12th of February, at the regular rate; no charge, so far as appears, being then made for board. I confess to some doubt whether it was his intention to charge his board to the owner until he found he was displaced. However this may be, the £20 that were paid him appear to me enough to pay for any board, wages, or other damages which the owners ought to meet; and that payment, with the offer of the passage home, should have been satisfactory to the libellant. The £48 which he demanded included wages for three months after his actual services were ended, and board for the whole time he was in Liverpool. Under the contract which he made, no such damages could be awarded for a discharge in the port of Liverpool after the end of a voyage. In my opinion, he has been overpaid.

Libel dismissed.