DUNDEE MORTGAGE & TRUST INVESTMENT Co., Limited, *v.* COOPER and others.

(*Circuit Court, D. Oregon.* March 12, 1886.)

1. EVIDENCE—PROOF OF FOREIGN STATUTE.
   The testimony of a credible witness, whether a lawyer or a layman, with reasonable means of information, to the effect that a volume containing what purports to be a statute of a foreign country is commonly received in the business and courts of such country as such, is competent and sufficient proof of the existence of such statute.

2. CORPORATION—CERTIFICATE OF INCORPORATION.
   A certificate of incorporation under section 18 of the companies' act of Great Britain may be issued in duplicate, and at any length of time after the memorandum of association is registered in the office of the registrar.

3. SAME—PROOF OF.
   Such certificate, when delivered to the corporation, is a private writing in private custody, and cannot be proved by an examined copy. The original must be produced, if in existence.

Suit to Enforce the Lien of a Mortgage.
*Earl C. Bronaugh,* for plaintiff.
*Ellis G. Hughes,* for defendants.

DEADY, J.   This suit is brought to enforce the lien of a mortgage, given to secure the payment of a note for $10,000, with interest.   It was commenced on October 28, 1884, in the state circuit court for the county of Linn.   On March 12th the defendants, D. M. Cooper and Rebecca, his wife, J. H. Wilson and Mary, his wife, J. M. Wilson and Matilda, his wife, answered the complaint, denying the corporate existence of the plaintiff, whereupon the latter, on April 7th, removed the cause into this court, where the same was heard on February 3, 1886, on the complaint, answer, evidence, and exhibits.

On the hearing the point was made that the answer should have been replied to, and the court, without passing on the question, allowed the plaintiff to file a replication thereto, *nunc pro tunc,* which was done on February 5th.

It is alleged in the complaint that the plaintiff is a corporation, duly organized under the laws of Great Britain, with its principal office at Dundee, Scotland; that on April 14, 1881, the Oregon &

Washington Mortgage Savings Bank, a corporation also duly organized under the laws aforesaid, loaned to the defendant D. M. Cooper the sum of $10,000, for which he made and delivered to said corporation his promissory note, payable to its order, on December 1, 1885, and also five other notes, payable to its order, on December 1, 1881, 1882, 1883, 1884, and 1885, respectively, for the several amounts of interest payable on said loan at said dates, at the rate of 10 per centum per annum, amounting in the aggregate to $14,632.90, and at the same time, together with the defendant Rebecca, his wife, executed and delivered to said corporation a mortgage of sundry parcels of land in said county of Linn, as a security for the payment of said notes, which was duly recorded on June 9, 1881; that on May 15, 1882, the defendants D. M. Cooper and Rebecca, his wife, conveyed said land to the defendant J. H. Wilson, in part consideration whereof the latter assumed and agreed to pay the notes aforesaid; that on February 23, 1883, said Oregon & Washington Mortgage Savings Bank, for value received, assigned said notes and mortgage to the plaintiff herein, who is now the owner of the same; that said defendants Cooper and Wilson have not paid said notes or any one or part thereof, and therefore the plaintiff, pursuant to a provision in said mortgage, now declares the whole of the principal sum of said loan, and the interest accrued thereon to be presently due; that, by the terms of said mortgage it is also provided that in case a suit is required to be brought to enforce the lien of the same, that there shall be taxed in favor of the plaintiff therein an attorney's fee of 10 per centum on the amount due on said notes; that the defendants George E. Chamberlain, W. E. Edwards, N. Whealdon, J. M. Wilson, and Matilda, his wife, have some interest in or lien on the premises, subsequent to the mortgage aforesaid, the nature or value of which is unknown to the plaintiff. The complaint prays for a decree against D. M. Cooper and J. H. Wilson for the sum of $12,632.90, and $1,000 attorney's fee, together with costs and disbursements, and, in default of payment thereof, for the sale of the premises to satisfy the same.

The defendants D. M. Cooper and J. H. Wilson, having contracted with the Oregon & Washington Mortgage Savings Bank as a corporation, concerning the payment of this money, are estopped thereby to deny its corporate existence, or power to make such contract. *Oregonian Ry. Co.* v. *Oregon Ry. & Nav. Co.,* 10 Sawy. 470; S. C. 22 Fed. Rep. 245; Ang. & A. Corp. (9th Ed.) 640. But as to the assignee of such corporation, the plaintiff, the case is otherwise. The plea or answer of the defendants purports to be in abatement. A denial of the corporate existence of a corporation not only controverts its right to sue, but also the cause of action. However, it seems that a party may, if he will, plead such non-existence in abatement only. *Oregonian Ry. Co.* v. *Oregon Ry. & Nav. Co.,* 10 Sawy. 469; S. C. 22 Fed. Rep. 245. This plea or answer consists simply of a denial of the allegation in the complaint that the plaintiff is a corporation duly

organized under the laws of Great Britian.    In effect it is the old plea of *nul tiel* corporation.

By the provisions of the Code, under which these pleadings were made, this affirmative and negative allegation made an issue.    Together they constitute a fact, affirmed on the one side, and denied on the other.    There is no new matter in the answer, and therefore there is nothing really to reply to.    Nevertheless, it seems, that at common law, the analogous plea of *nul tiel* record requires a replication to put the matter formally in issue.    1 Chit. Pl. 632.    And in equity it seems that the matter in a plea, whether negative or affirmative, is put in issue by a replication thereto.    Story, Eq. Pl. § 697.    This anomaly could and should be cured by a rule of the supreme court dispensing with a replication to a plea, unless and only so far as it contains new matter.

Upon the evidence taken on the plea two questions arise: (1) Is the proof of the law of Great Britian, under which it is claimed the plaintiff was incorporated, sufficient? and (2) is the proof of the incorporation thereunder also sufficient?

The only witnesses examined as to the law are William Mackenzie and Hugh Rogers.    The former is a resident of Dundee, Scotland, a stockbroker, and the secretary of the plaintiff from the time of its organization.    The latter is the resident agent of the plaintiff in Portland for the past three years; but he is a native of Scotland, and resided there until he came here, during which time he was engaged as an accountant, for six years in Edinburgh, in the management of corporations organized under the law of Great Britain, and with the winding-up of the same, under the supervision of the court of sessions, the highest court in Scotland.    They both testify that Exhibit A, a bound volume of statutes, purporting to be the acts of the parliament of Great Britain on the subject of "the incorporation, regulation, and winding-up of trading companies and other associations," including the act cited as "The Companies' Act, 1862," and sundry amendments thereto, made in the years following, and as late as 1883, is published by William Blackwood & Sons, the queen's printers, in Scotland, under license from the government, and is commonly received in Scotland as an authoritative copy thereof; and Mr. Rogers says that copies of this publication are universally received by all professional men and all courts in Scotland as official, and there are no other official copies of the companies' act in use there; and that the book is generally received in Scotland as published by authority of a license from the government issued by the lord advocate for the time being.    On the first page of the book there is an imprint of the royal arms, and the title:

"*Anno vicesimo quinto & vicesimo sexto Victoriæ Reginæ.*
"Cap. LXXXIX.

"An act for the incorporation, regulation, and winding-up of trading companies and other associations, (7th August, 1862.)"

Then follows the act,—the enacting clause being to the effect that the same is enacted by the queen with the advice and consent of the lords and commons in parliament assembled,—the first section thereof providing that it may be cited as "The Companies' Act, 1862."

In *Ennis* v. *Smith*, 14 How. 426, the supreme court say that there is no general rule prescribing the mode of authenticating a foreign statute, but that it "may be verified by an oath, or by an exemplification of a copy under the great seal of the state, or by a copy proved to be a true copy by a witness who has examined and compared it with the original, or by a certificate of an officer, properly authorized by law, to give the copy, which certificate must be duly proved. But such modes of procedure as have been mentioned are not to be considered exclusive of others, especially of *codes of laws* and accepted histories of the law of a country. In that case the court held that a copy of the French Civil Code was sufficiently proved when it bore the imprint of the French royal press and was received in exchange between the two countries, with the indorsement: "*Les Garde des Sceaux de France a la Cour Suprème des Etats Unis.*"

By the Code of Civil Procedure of this state (section 733, sub. 4) it is provided that "the proceedings of the legislature of a foreign country" may be proved "by journals, statutes, or resolutions published by their authority, respectively, or *commonly received in that country as such.* * * *"

The argument of counsel for the defendant assumes that a foreign statute, unless shown by a sworn or certified copy of the original, can only be proved by the testimony of an expert, who, from personal familiarity with the subject, is able to state from memory the exact provisions of the act, and the accepted interpretation of it in the place of its enactment. But this is altogether too narrow and impracticable a view of the subject. Both the common or customary and the statute law of a foreign country may be shown by books of acknowledged or proven reputation or credit therein. In this age of printing and publication the law is no longer locked up in the breast of the human oracle, but is deposited in unsealed volumes, where it can be known and read of all men. The testimony of a credible witness, having ordinary means of information, that a certain publication is commonly received as a true copy of a statute in the country of its enactment is better and more satisfactory evidence of the existence of the statute than the testimony of any expert, speaking from memory alone.

In the case of *The Pawashick*, 2 Low. 142, Mr. Justice LOWELL examines this subject with his usual care and good sense. The opinion contains many valuable and timely suggestions on the subject. In the course of it (page 146) he says:

"The relations which we hold to England in the common origin of our laws, a similar mode of legal reasoning, the habit of studying and citing the English cases, the common language, and frequent intercourse between the

two countries, render it safe and proper to adopt a similar practice with respect to the laws of that country that the states of this Union have generally found it expedient to carry out in relation to each other. It was soon found in trials in the United States that the danger of mistaking the laws of the other states was, on the whole, a less evil than the danger of injustice and delay, if the strict proof were required in every case. In consequence of this discovery many of the states have passed laws admitting the printed statutes and books of reports of sister states to be read in evidence. See Story, Confl. Laws, (Redf. Ed.) § 641*a*. But before these statutes were passed, or without their aid, the courts of some states have taken this step for themselves. *Thompson* v. *Musser,* 1 Dall. 458; *Raynham* v. *Canton,* 3 Pick. 293; *Young* v. *Templeton,* 4 La. Ann. 254; *Lord* v. *Staples,* 3 Fost. 448. In two of these cases a query was made whether foreign statutes, strictly so called, could be proved by printed copies only, even with evidence tending to show the authenticity of the copies. But such statutes have been received in two cases in which it was merely proved that they were bought of the public printer, (*Jones* v. *Maffet,* 5 Serg. & R. 523; *In re Certain Casks of Hardware,* 4 Law Rep. 36;) in another, because the Code had been promulgated by the executive department of our government as authentic, (*Talbot* v. *Seeman,* 1 Cranch, 1;) in another, because the copy had been sent to the supreme court of the United States by authority of a foreign government, (*Ennis* v. *Smith,* 14 How. 400.) In that case it was said, as the *ratio decidendi,* that a foreign written law may be received when it is found in the statute book, with proof that the book has been officially published by the government that made the law. This does not exhaust the list of cases nor the actual or possible modes of authentication. The only rule to be made out of the late American cases is that *the copy of the statute must be shown, to the reasonable satisfaction of the court, to be genuine.* Now, we all know, and it is virtually admitted in this case, as I understand the argument, that we are fully as well able to verify the printed copies of the merchant shipping act as any expert could be. In the case in 4 Law Rep. 36, Judge BETTS said he should have received the statute, without the oath which proved it to have been bought of the queen's printers. The law is a progressive science, and, if printed books have superseded manuscripts, and are cited instead of certified copies, we may as well acknowledge the fact and act accordingly. Between the doctrine, which has never obtained in America, if it does anywhere, that there must always be a sworn expert, and one which shall admit printed books of known authority to prove foreign statutes, I see no safe middle ground."

The proof in this case is altogether satisfactory that the publication in question is commonly received in Scotland as a true copy of the statute of Great Britain called "The Companies' Act, 1862." There is no room for doubt, and no one conversant with the matter has any on the subject. The witnesses who state the fact are credible. Nothing appears to affect either their veracity or intelligence; and their means of knowledge are sufficient to enable them to speak unqualifiedly, and entitles them to be heard with confidence. It is not necessary that they should be lawyers. They do not testify as experts, although they might be able to, within the rule laid down in *American Life Ins. & Trust Co.* v. *Rosenagle,* 77 Pa. St. 514, but as common witnesses, to a fact within their observation, namely, that the publication in question is commonly received in the business and courts of Scotland as sufficient proof of the existence and terms of the act concerning the incorporation of trading companies of August 7,

1862. The provisions of the companies' act relative to the question of the incorporation of the plaintiff, are as follows:

"Sec. 6. Any seven or more persons associated for any *lawful purpose* may, by subscribing their names to a memorandum of association, and otherwise complying with the requisitions of this act in respect of registration, form an incorporated company, with or without limited liability."

Among other things, sections 14 and 17 provide that "the memorandum of association" must, in certain cases, and may in any, "be accompanied, when registered, by articles of association, signed by the subscribers to the memorandum of association, and prescribing such regulations for the company" as said subscribers "deem expedient:" and that said memorandum and articles, "if any, shall be delivered to the registrar of joint-stock companies, * * * who shall retain and register the same." Section 18 provides, among other things, that upon the registration of the memorandum and articles "the registrar shall certify under his hand that the company is incorporated;" and "the subscribers of the memorandum of association, together with such other persons as may from time to time become members of the company, shall thereupon be a body corporate, by the name contained in the memorandum of association, capable forthwith of exercising all the functions of an incorporated company * * *"

From this it appears that the law of Great Britain authorized the incorporation of the plaintiff; and the next question is, was it ever organized thereunder?

Mr. Mackenzie testifies that Exhibit B is a true copy of the memorandum and articles of association of the plaintiff, compared by him with the originals on file in the office of the registrar of joint-stock companies for Scotland. The memorandum and articles of association, being deposited and registered in a public office, are public writings; and may be proved by a copy examined and compared with the originals by a witness who swears to its correctness. The evidence is sufficient that the Exhibit B is a true copy of the originals; and it appears therefrom that the proper number of persons, on April 21, 1876, duly signed a memorandum of association for the incorporation of "The Dundee Mortgage & Trust Investment Company, Limited," with a registered office in Scotland, for the purpose, among others, of "making advances of money, repayable with interest," on "mortgages and other liens of and over" real property in any of the United States, and the purchase of mortgages or funds therein.

Mr. Mackenzie also testifies that the certificate printed on page 23 of Exhibit B is a true copy of a certificate of incorporation given to the plaintiff by the registrar, pursuant to section 18 of "the companies' act," on May 2, 1876, and that Exhibit D, dated December 19, 1879, is an original certificate, so issued to the plaintiff, and in the custody of the witness, as its secretary. In the latter one it is certified that the plaintiff "was incorporated under the companies' acts, 1862 and

1867, as a limited company, on the second day of May, 1876," while in the copy it is stated that the plaintiff "is this day incorporated under the companies' acts, 1862 and 1867, and that it is a company limited by shares." The certificate of incorporation, when delivered to the plaintiff, became a private writing, in private custody, and cannot be proved, so long as it is in existence, by a copy, or otherwise than by the production of the original. It is not sufficient that the witness produces a paper, and swears that he has compared it with the original, and that it is a true copy thereof. The adverse party is entitled to an inspection of the original; but, as it is a private writing, in private custody, he cannot have this inspection unless it is produced before the examiner, and, when produced, the examiner may make a copy of it, and attach the same to the testimony of the witness, and return him the original, unless the case is one where the integrity of the latter is questioned, and its physical features are material to the inquiry.

Counsel for the defendants suggests that Exhibit D cannot be received as the certificate authorized by section 18 of the act, because he says it is a duplicate of a later date, so to speak, of the one of May 2, 1876, the original of which is not produced. No authority is cited on the point, and the statute is silent on the subject. But, considering the nature and purpose of the certificate, that it is given to the corporation simply as the convenient evidence of its existence and right to act as such, no reason occurs to me why the registrar may not, if he will, issue it in duplicate; and if he does, one of them is of the same force and effect as the other, for they are both originals. It may be very convenient, where, as in this case, a corporation is formed for the transaction of business in many parts of the world, to have the certificate in duplicate, or even more, so as to enable it to defend or assert its corporate character when and wherever it may be necessary. But it is not clear that these instruments are duplicates. It is true that while couched in different language, they are essentially the same. Rapalje & L. Law Dict. "Duplicates." They both state the fact that the plaintiff became a corporation, by the name assumed, under "The Companies' Act, 1862," on May 2, 1876. But, as some years appear to have elapsed between the date of the certificates, it may be more correct to characterize them as originals issued successively, but separately, on the same facts or transaction, than as duplicates, which implies, I think, simultaneous execution or origin. And, assuming this to be the fact, the force and effect of the second certificate as evidence of the fact stated therein, is not at all impaired by the circumstance that it was issued some time after the registry of the memorandum and articles. It is doubtless contemplated by the act that the registrar will issue the certificate as soon as the corporation is entitled to it. But there is nothing in the act or the circumstances of the case that makes its validity depend on the date of its issue. So far, at least, as third persons are concerned, it is immaterial when it issues, so that it is subsequent to the regis-

tration of the memorandum and articles of association by the registrar. But, speaking by the evidence, this is really the only certificate that ever was issued to the plaintiff. The attempt to prove the issue of one on May 2, 1876, failed. The original was not produced and the alleged copy is not competent evidence of the fact.

On the whole, my conclusion is that the plea in abatement is not proved. On the contrary, it satisfactorily appears plaintiff is a duly-organized corporation under the laws of Great Britain, with power and authority to take an assignment of these notes and mortgage, and to maintain this suit thereon. This defense is purely technical, and utterly without merit. It is admitted that the defendants have the legal right to make it, even if they should thereby succeed in defrauding the plaintiff out of this large sum of money. In the administration of justice by finite beings, according to finite laws, it must sometime happen that the wrong prevails. But happily, in this case, the attempt to escape the payment of an honest debt, on the ground set up in this plea, has so far come to naught.