### Case No. 4,426.

#### The ELWINE KREPLIN.

[9 Blatchf. 438.] [1]

Circuit Court, E. D. New York. Feb. 23, 1872. [2]

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Reversing The Elwin Kreplin, Case No. 4,427.]

Dennis McMahon, for libellants.
Edward Salomon, for claimants.

WOODRUFF, Circuit Judge. By the tenth article, of the treaty made by the United States with the king of Prussia, on the 1st of May, 1828 (8 Stat. 378, 382), it is provided, that "the consuls, vice-consuls, and commercial agents,"—which each of the parties to the treaty is declared entitled to have in the ports of the other—"shall have the right, as such, to sit as judges and arbitrators, in such differences as may arise between the captains and crews of the vessels belonging to the nation whose interests are committed to their charge, without the interference of the local authorities. * * * It is, however, understood, that this species of judgment or arbitration shall not deprive the contending parties of the right they have to resort, on their return, to the judicial authority of their country." To this general rule there is a qualification: "Unless the conduct of the crews, or of the captain, should disturb the order or tranquility of the country, or the said consuls, vice-consuls, or commercial agents should require their assistance" (the assistance of the local authorities,) "to cause their decisions to be carried into effect or supported." This treaty is, by the constitution of the United States, the law of the land, and the courts of justice are bound to observe it. When a case arises which is within this provision of the treaty, jurisdiction thereof belongs to the consul, vice-consul, or commercial agent of the nation whose interests are committed to his charge, and with the exercise of that jurisdiction the local tribunals are not at liberty to interfere, unless such consul, vice-consul, or commercial agent requires their assistance, to cause their decision to be carried into effect or supported.

In the present case, the mate and several of the crew of the barque Elwine Kreplin prosecuted their libels against the vessel, in the district court, for the recovery of wages alleged to be due to them, which the master of the vessel denied to be due, upon various grounds; and the vessel was attached to answer. The master of the barque, intervening for the interest of the owner, sets up, in his answer, various grounds of defence to the claim, some of which arise under the laws of Prussia; and, especially, he invokes the protection of the treaty above mentioned, and denies the jurisdiction of the district court, alleging, moreover, that the matter in difference—the claim of the libellants for wages—has already, in fact, been adjudicated by the Prussian consul at the port of New York. Before the cause was tried in the district court, the consul-general of the North German Union presented to the district court his formal protest against the exercise of

jurisdiction by that court in the matter in difference. He invoked therein the treaty above referred to, and claimed exclusive jurisdiction of such matter in difference; and he also declared, that, before the filing of the libel, the said matter had been adjudicated by him, and insisted that his adjudication was binding between the parties, and could only be reviewed by the judicial tribunals of Prussia.

The barque is a Prussian vessel, the mate and crew are Prussian seamen, who shipped in Prussia, under and with express reference to the laws of Prussia, referred to in the shipping articles, and it should be assumed, that the treaty which binds this nation and its citizens and seamen, binds also Prussia and her subjects and seamen. The consul-general of the North German Union is commissioned by the king of Prussia, and, by certificate of the secretary of state of the United States, under the seal of that department, it appears, that the executive department of the United States recognizes the consuls of the North German Union as consuls of each one of the sovereign states composing that Union, "the same as if they had been commissioned by each one of such states." The kingdom of Prussia is one of the states composing the North German Union. The treaty does not require that the consuls, vice-consuls, &c., should bear any specific name. It is sufficient, that the "interests" of Prussia "are committed to their charge," and quite sufficient, that the government of the United States, by its executive, recognizes the consul as consul of the kingdom of Prussia.

The discussion of the case at the hearing on the appeal, was, on the part of the libellants, very largely devoted to the merits of the claim for wages, upon principles applicable, it may be, to the subject, if no such treaty was in force, and under decisions of our courts in reference to the rights and duties of seaman and master, the effect of the misconduct of either upon the obligation of the other, for the purpose of showing that the treatment of the libellants by the master exonerated them from their duty to serve according to the terms of the shipping articles, and also from all others of its stipulations, even from such as arise from the laws of Prussia forming a part of the terms, stipulations, and conditions which enter into the relation of the crew to the master and owners, and to the vessel. That discussion was very full, and was presented, in argument, with great ability, by the counsel for the libellants. With most of the rules of law invoked by the counsel, when considered apart from and independent of any treaty stipulation, the claimants have no contest; and they are, no doubt, settled, by the cases cited. But the prior question of jurisdiction must be determined, before it is competent even to enquire into the merits of the libellants' claim to recover their wages.

In the first instance, it would seem clear, that a claim of the crew of a Prussian vessel to recover wages which the master of the vessel either denied to be due, or refused to pay, was, par eminence, a matter in difference between the captain and crew, which, by the very terms of the treaty, the Prussian consul or vice-consul had jurisdiction, as judge or arbitrator, to determine, "without the interference" of the courts of this country; and such jurisdiction, when it exists, is, by such terms as these, exclusive. It is, however, claimed, that the present cause is not at all embraced within the treaty, for the reason, that it is a proceeding in rem, to enforce a maritime lien upon the vessel itself, and not a difference between the captain and crew; and, also, because the Prussian consul has no power to conduct and carry into effect a proceeding in rem for the enforcement of such a lien.

The treaty can receive no such narrow and technical construction. The master is the representative, in this port, of the vessel, and of all the interests concerned therein. He is plainly so regarded in the treaty. The matter in difference in this cause is the claim for wages. That arises between the crew and the master, either as master, or as the representative here of vessel and owners. It is precisely that which is in litigation in this case. The lien, and the proceeding in rem against the vessel, appertain to the remedy, and only to the remedy. The very first step in this cause is to settle the matter in dispute. If the claim be established, then, as incident to the right to the wages, the lien and its enforcement against the vessel follow. The district court can have no jurisdiction of the lien, nor jurisdiction to enforce it, if it has no jurisdiction of the difference or dispute touching the claim for wages. To hold that the jurisdiction of the consul is confined to cases in which there is no maritime lien, and in which no libel of the vessel could, apart from the treaty, be maintained, is to take from the treaty very much of its substance. The existence of any lien, and of any right to charge the vessel, is in difference here. To say, that the treaty gives the consul jurisdiction of claims against the master in personam, and does not include a claim to remove the vessel itself from his custody, as the owner pro hac vice, or as the representative of all the interests therein, that the voyage may be broken up, and the vessel sold for the wages of the crew, and that an effort, by judicial proceeding, to do this, is not included in the terms, a difference arising between captain and crew, seems to me to destroy the very substance of the stipulation, and defeat its obvious purpose, to confine both masters and crews of Prussia to the rights and obligations of the Prussian laws, and compel obedience to its mandates. And, be it observed, the treaty gives the same protection to, and requires the like obedience by, the masters and crews of vessels of the United States. It does not add to the legal reasons for this view, but, if a vessel of the United States were sold in a port in Prussia, to pay the wages of its crew, alleged by the master not to be payable, and in repudiation of any right of the United States consul at that port to act as judge or arbitrator upon that claim, it would, at least, stimulate our quickness of apprehension to discover, and would incline us to insist, that the treaty intended to protect our shipowners against the application of foreign laws, and the decisions of foreign courts, to our vessels and the relations of the master and crews thereof.

To the suggestion, that the consul has no power to enforce the maritime lien, and cause the vessel to be sold, to satisfy the wages, if he should find that wages are due and payable, it is sufficient to say, that the treaty has been deliberately entered into, and has become the law for both nations. Each preferred to employ its own officers. The power given to consuls to act as judge or arbitrator is not made final. The parties have the right of resort to the tribunals of their own country, without being concluded by the decisions of the consul. This was deemed a sufficient protection, and to afford, for the time being, a sufficient remedy to both master and crew; and it is not for this court to say, that the remedy here, by attachment of the vessel, will be more efficient and useful, and, on that ground, to apply it. Besides, this court cannot know that the remedy by resort to the vessel is not, if it exists, so regulated in Prussia, that it was intended that her seamen should not invoke against the vessel the remedies permitted by our laws, under the mode of administration and rules of decision by which our courts are governed. And, further, under the expressed exception, which permits resort to local tribunals by consuls, &c., who may require their assistance to cause their decisions to be carried into effect or supported, it is plausible, at least, to say, that, if the consul decide, on a difference between captain and crew, that wages are payable, the power of the court to attach and condemn the vessel for their payment may be invoked to support and give effect to such decision.

Again, it is said, that, in this case, the captain and crew were not confronted before the counsel, witnesses were not examined, no adjudication in writing was made, but the consul only orally declared his judgment of the matter in difference, after hearing the statement of the master and the statement of the libellants, and then declared that he had nothing further to do therein. The proceeding does not, it is true, conform to our ideas of the requisites of a judicial proceeding; but, are the courts of this country to prescribe to the Prussian consul the forms and modes of proceeding which he must adopt when he acts as a judge or arbitrator between master and crew under this treaty? Must he follow the

practice, and be governed by the rules, governing trials and arbitrations under our laws? Must our consuls in Prussia follow the rules and practice of the courts of that kingdom? If so, then the district court here was sitting as a court of error, to review the judgment or award of the Prussian consul. What can this court say are the formal requisites of a Prussian arbitration? It is manifest, by the reservation of the right to resort to the judicial tribunals of the home country, without being concluded by the decision of the consul, that the proceeding before him as an arbitrator or judge was intended to be summary, and its conduct left very much in his discretion; and, especially, it is manifest, that the nations respectively intended to confide in their consul, and temporarily entrust to him the adjustment of differences between officer and crew of their vessel in the port of the other, and it was not intended that the courts of such other nation should sit in judgment upon the form or regularity, or the justice, of the acts of the consul, or interfere therewith in any manner. It was deemed safe and proper to leave to such consuls this temporary administration of the interests of their seamen abroad, assured that they would act with fairness and integrity therein, but yet giving the right of full and final investigation and adjudication at home, where home laws, home remedies, and home modes of investigation could be resorted to. The district court here not only passed upon the requisites of the proceeding as judicial, or as an arbitrament, but assumed to inquire into the details of the evidence, and the truth of the declared grounds upon which the vice-consul testified that he acted, and which he says were before him in the admissions of the crew—thus, in effect, reviewing the law and the facts which the consul made the basis of his decision.

It is claimed, that the consul did not act as judge or arbitrator to determine this case, and that, he not having taken jurisdiction, a proceeding in our courts is no interference in disregard of the treaty. It is by no means clear, that the attachment of the vessel, on the libel of the crew, is not, in itself, such an interference as precludes the action of the consul. But in this case, the argument disregards the clearly established fact, that the consul or his vice consul, (who is, in terms, included in the treaty, and whose acts in the matter the consul recognizes,) did hear the parties respectively. On the statement of the case by the crew (who, whichsoever of them was the first speaker, had the opportunity to tell their story,) he pronounced against them. On their own story, he decided that they had forfeited their wages, by the Prussian law, applied to their contract of shipment; and, afterwards, when this suit was commenced, he formally represents to the court, that he had already adjudicated the matter in difference, and claimed that his jurisdiction for that purpose is exclusive of the courts of this country. It was after such declaration of his

decision to the crew, that he, knowing that the vessel was laid up, advised them to see the captain, and, by civil and conciliatory deportment, induce him to waive the forfeiture and pay the wages which had accrued. In the situation in which the vessel and her master then were, it is obvious, that, if the men had forfeited their wages, (of which I here express no opinion,) their acts had wrought no great harm, the captain had no present need of the services of so many, and many considerations might properly have moved him to pay their wages and let them go. The advice of the consul indicated that he thought the loss of their service was no inconvenience to the captain and, even if wrong theretofore, they had claims to his consideration, while destitute and in a foreign country, which might and, perhaps, ought to induce him to pay their wages. This is all there is of the argument, that the consul himself regarded the crew as practically discharged.

I do not propose to examine the merits of the libellants' claim for wages. That they were, on the requisition of the consul, and without sufficient grounds therefor, held in prison as deserters, is most probable. That their departure from the vessel, and going ashore without leave, and against the will of the master, (save as to one, who had his consent,) is not desertion by our law, unless it was done without the intention to return, is, no doubt, true. That the master did not, in fact, consent to the discharge of any of them, is, I think, clear, while I think it in the highest degree probable, that, if this difficulty had not arisen, he would, in view of the laying up of the vessel, have consented to part with most of them.

I do not think it certain, that an imprisonment, on the requisition of the consul, though induced by a statement of the facts by the captain, operated to discharge the seamen from their articles, even though the imprisonment was not warranted by the facts. Jordan v. Williams [Case No. 7,528]. Nor is it certain that, under this treaty, and the act of March 2, 1829 (4 Stat. 359), a state magistrate can have no jurisdiction to arrest and detain a seaman charged as a deserter. True, the laws of the United States may not make it the duty of a state judge to act; but it does not follow, that, if he is included in the law, his acts will be without authority. There are many powers conferred upon state magistrates by the laws of the United States, which, if executed, are valid. Whether such magistrate is bound to accept the authority and act upon it, is another question. The act of 1829, in determining the duty, confers the power on "any court, judge, justice, or other magistrate having competent power, to issue warrants" to arrest, &c. See Pars. Shipp. & Adm. 102; Kentucky v. Dennison, 24 How. [65 U. S.] 66, 107, 108. It is apparent, that the requisition was given to the master to be delivered to the justice at Staten Island, who,

as the captain informed the consul, then detained the seamen; and if, as stated by counsel, (though it does not appear as printed in the copy proofs handed to me,) it was addressed to "any magistrate," &c., the power of the magistrate is not clearly wanting.

But all these and other questions go to the merits. They bear on the broad question, whether, under the terms of the shipping articles, and the Prussian rules contained in the navigation book, &c., the seamen had a right to their wages. The effect of the stipulation not to sue in a foreign country, which appears to be one of those rules, also, and what amounts to a discharge from the contract, actual or constructive, are questions on the merits; and the sympathy, which the condition of these men, penniless in a foreign land, whether with or without fault on their part, must awaken in every mind susceptible of human emotion, strongly inclines to a condemnation of the conduct of the master in this matter.

But I am constrained to the conclusion, that the treaty required that this matter in difference should have been left where, I think, the treaty with Prussia leaves it—in the hands, and subject to the determination, of their own public officer. The necessary result is the dismissal of the libels.