## THE BOUND BROOK.

(District Court, D. Massachusetts. April 25, 1906.)

No. 1,723.

1. SEAMAN—VALIDITY OF CONTRACT FOR SERVICE—ADVANCE PAYMENT OF WAGES.

The advance payment of wages to a seaman, in violation of Act Dec. 21, 1898, c. 28, § 24, 30 Stat. 763 [U. S. Comp. St. 1901, p. 3079], does not render the contract for service made by the shipping articles void, under Rev. St. 4523 [U. S. Comp. St. 1901, p. 3075], where it is not shown that the unlawful payment entered into the contract as one of the things agreed on by the parties.

2. ADMIRALTY—JURISDICTION OF SUIT FOR SEAMAN'S WAGES—TREATY WITH GERMANY.

Under article 13 of the Treaty of December 11, 1871, between the German Empire and the United States (17 Stat. 928), which gives to the consular officers of each country exclusive power to take cognizance of and determine differences between the captains and crews of vessels of their own nation, and prohibits the courts of the other country from interfering therein; a court of admiralty of the United States is without jurisdiction of a suit against a German vessel to recover wages, brought by seamen who are not citizens of the United States, but who signed before a German consul in a port thereof and were discharged in another port after completing their term of service without objection; and such jurisdiction is not conferred merely by the fact that they were paid wages in advance, in violation of Act Dec. 21, 1898, c. 28, § 24, 30 Stat. 763 [U. S. Comp. St. 1901, p. 3079].

[Ed. Note.—Admiralty jurisdiction of suits between foreigners, see note to Fairgrieve v. Marine Ins. Co., 37 C. C. A. 193.]

In Admiralty. On plea to jurisdiction.

John J. O'Connor, for libelants.

Theodore H. Tyndale, for claimant.

DODGE, District Judge. In this libel for wages the libelants allege that they signed articles on July 18, 1905, at New Orleans, where the steamer then was, for a trip to Jamaica and back to Boston as seamen and firemen on board her, at certain rates of wages; that they went on board on July 19th, have performed their duties during the trip, and that certain sums are now due them, payment of which has been refused.

The steamer, as below appears, is a German vessel. The libelants allege that they signed the articles before the German Consul at New Orleans. Her owner and claimant, a German subject, has filed a plea to the jurisdiction of the court which is based upon article 13 of the Convention of December 11, 1871, now in force, between the United States and the German Empire (17 Stat. 921, 928). The article referred to reserves to the Consuls of each Government respectively, "exclusive power to take cognizance of and determine differences of every kind, arising either at sea or in port, between the captains, officers and crews" of its vessels, "and specifically in reference to wages and the execution of mutual contracts," and provides that "in such differences neither any court or authority shall on any pretext interfere."

The German Consul at Boston has filed in court a protest, on behalf of the Imperial German Government, against the assumption by this court of jurisdiction in the case. The above provisions of the existing treaty between his government and the United States are therein submitted as the grounds of protest.

At the hearing upon the question of jurisdiction thus raised it was agreed by counsel for the respective parties that none of the libelants are citizens of the United States, that the steamer is a German vessel sailing under the German flag, and that her master is a German subject. These agreements render it unnecessary to consider the exceptions and motion to dismiss which have been filed by the claimant without waiving his plea to the jurisdiction. The only objections thereby raised are that the libel does not allege the nationality of the vessel, a fact which should have been alleged, nor that the libelants are United States citizens.

It was further agreed at the hearing that the libelants were informed, both before and after their libel was filed, that their claim for wages would be adjusted at the German Consulate; also that the master of the steamer lodged in the hands of the Consul funds sufficient to settle and adjust all claims properly due the libelants.

The libel as filed set forth a simple claim for unpaid wages earned on board the steamer, such as would be clearly excluded from the jurisdiction of the court by the treaty provisions above quoted. It alleged no facts whatever which could in any event warrant a ruling that those provisions do not apply.

The libelants were permitted at the hearing, however, to amend by inserting in their libel the additional allegations that the master refused to pay the wages claimed, "on the ground that he had previously paid advance money on account of each libelant at New Orleans, and that said sums should be deducted from their wages due them at the end of the voyage at the Port of Boston, contrary to the laws of the United States."

Is the case thus presented one of which the court may take jurisdiction, or is it one of which the German Consul has exclusive cognizance under the treaty? Inasmuch as the libelants are none of them citizens of the United States, and the vessel libeled is foreign, the court is not bound to take jurisdiction. It will use its discretion whether to exercise jurisdiction or not. Where, as in this case, the voyage is ended, jurisdiction is usually exercised in the absence of reasons to the contrary, and it may be exercised even against the protest of the Consul. Such a protest, however, is always an important circumstance for consideration. But if there are treaty stipulations with regard to the Consul's right to adjudge controversies arising between the master and crew, such stipulations are to be fairly and faithfully observed. The Belgenland, 114 U. S. 355, 364, 5 Sup. Ct. 860, 29 L. Ed. 152; The Becherdass Ambaidass, 1 Lowell, 569, 572, 573, Fed. Cas. No. 1,203; The Pawashick, 2 Lowell, 142, Fed. Cas. No. 10,851.

In Tellefsen v. Fee, 168 Mass. 188, 46 N. E. 562, 45 L. R. A. 481, 60 Am. St. Rep. 379, the effect of a treaty with Sweden and Norway,

containing provisions similar to those relied upon by the claimant, was considered by the court. It was held that under the treaty the courts of this country have no jurisdiction of an action for wages brought by a seaman against a master of a Norwegian vessel. "Such a treaty," it was said, "has almost uniformly been held to take away all right of action for wages in the courts of this country by a seaman coming within the scope of the treaty, whether the action be in rem or in personam." The decisions referred to by the court, viz., The Elwine Kreplin, 9 Blatchf. 438, Fed. Cas. No. 4,426; The Salomoni (D. C.) 29 Fed. 534; The Burchard (D. C.) 42 Fed. 608; The Marie (D. C.) 49 Fed. 286; The Welhaven (D. C.) 55 Fed. 80, are all of them decisions in admiralty. The Burchard deals with the same treaty and the same provisions as are here in question. In view of them it cannot be denied, nor is it attempted to deny in this case, that to such provisions must be allowed in general the effect given them by the Massachusetts decision which has been quoted. That the voyage for which wages are claimed has been ended is no reason for allowing any less effect to such provisions. The voyage had been ended in Tellefsen v. Fee and in the Welhaven above referred to.

The libelant's contention is that section 24 of Act Cong., Dec. 21, 1898, c. 28, 30 Stat. 763 [U. S. Comp. St. 1901, p. 3079], has been violated by the payment of advance wages to them at New Orleans; that the contract of shipment under which they served was therefore void, under Rev. St. § 4523 [U. S. Comp. St. 1901, p. 3075], because made contrary to the provisions of the act referred to; that they were therefore never legally members of the steamer's crew; and that, unless they did lawfully become members of the crew, the difference which has arisen in reference to their wages is not within the treaty provisions.

The decision in Patterson v. The Eudora, 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002, establishes that section 24 of the act of 1898, which by its terms (clause f) is made applicable to foreign vessels as well as to vessels of the United States, does properly so apply; and, therefore, so far affects all contracts of shipment made in the United States, though for service on foreign vessels, that wages paid in advance at the time of the shipment may be recovered on completion of the voyage as if they had never been paid, although such payments are not due either by the terms of the contract or according to the law of the country to which the vessel belongs.

Section 24 of the act of 1898 applies therefore to the shipment of the libelants on this steamer at New Orleans, and it follows, from the express language of clause f, that, if advance wages were paid them at the time of their shipment, the master, owner, agent, or consignee who made the payment became liable to a penalty. It may also follow from the general application of the section to foreign vessels that the advance payments would be no defense to a claim in our courts for full wages, as provided in clause a, where our courts are free to take jurisdiction. But the entire application of the section to foreign vessels is by clause f expressly made subject to the proviso that treaties in force do not conflict. In Patterson v. The Eudora, above referred

to, no question of a treaty arose, the vessel was British, and there is no treaty with Great Britain upon this subject. See The Eudora (D. C.) 110 Fed. 430. The case was therefore one of which the United States courts were free to take jurisdiction.

But a contract of shipment, to be void under Rev. St. section 4523, must have been made contrary to the provisions of some act of Congress, and it has nowhere been provided in any act that a contract of shipment is to be regarded as unlawfully made, merely because there has been an advance payment of wages to be earned under it. Illegal though such a payment is, it can hardly be said to have the necessary effect of avoiding a contract of shipment which has once been lawfully made. And unless the unlawful payment is shown to have entered into the contract as one of the things agreed on by the parties, either expressly or by implication, as would be the case if it were paid or promised as part of the consideration, it is difficult to see how the making of the contract can be said to have been affected by it.

In The Troop (D. C.) 117 Fed. 557, affirmed on appeal as Kenney v. Blake, 125 Fed. 672, 60 C. C. A. 362, the agreement for an advance and its payment appeared by the articles signed. See Kenney v. Blake, 125 Fed. 673, 60 C. C. A. 362. In The Alnwick (D. C.) 132 Fed. 117, see page 119, and in The Neck (D. C.) 138 Fed. 144, the advance payments appear to have been made at the time the articles were signed. In all these cases it was held that the contract of shipment was void by reason of the advance payment. I find no other decisions which have so held. Patterson v. The Eudora, above discussed, does not so hold, nor does it necessarily so imply, although the facts in the case were not only that the advance payment was made at the time of shipment, but also that the contract provided for wages at the rate of one shilling for 45 days service, and $20 per month thereafter. This same provision in a contract of shipment was held in The Kestor (D. C.) 110 Fed. 432, to be a mere cover for an unlawful prepayment of $20, as no doubt it was; yet, while the provision referred to was held in that case to be void and full wages at $20 per month were decreed without deduction of the advance payment, it was not suggested that the contract was wholly void because of the void provision contained in it or because of the unlawful payment under it. In Commonwealth v. Bartlett, 190 Mass. 148, 76 N. E. 607, one among several instances of void shipments referred to by the court is thus described, "or if wages are advanced to a seaman contrary to the act of Congress." No question of such a shipment, however, was involved in the facts before the court, or in its decision, and the only authority cited upon the point is Kenney v. Blake, which has been considered above.

To admit, however, that the contracts of shipment in The Troop, The Alnwick, and The Neck were rightly held void, is not to admit that the same conclusion is required in the present case. It is not distinctly alleged in this libel that advance wages were in fact paid the libelants at New Orleans; but assuming that such an allegation is intended, and that advance payments were so made, there is still nothing to show that the payments in any way entered into the terms of the agreement

or- had any immediate connection with the making of the contract. If there were such payments at New Orleans, they were before the steamer left that port. Nothing further is stated regarding the time at which, or the circumstances under which, they were made.

The Troop, The Alnwick, and The Neck, moreover, all involved the question of the right of a seaman who had received advance wages to leave the vessel before the term of service for which he had shipped was completed. No such question is raised in this case. These libelants have performed all the service on board the steamer which they agreed to perform by the contract now claimed to have been void. They never sought to escape its obligations, nor, so far as appears, did they ever attempt to repudiate it in any way until after it had been fully performed on their part without objection. The contract indeed is set up in the libel as the foundation of their claim. The only difference between them and the master, which the libel discloses, is as to the amounts due them under it. I do not think that they can now be heard to claim, for the purposes of the argument, that it was void.

I find nothing in the case presented, therefore, to warrant the conclusion that the contract made by the libelants at New Orleans was or ever became wholly void by our law. But, even if the contrary were sufficiently shown, since the libelants have, at any rate, rendered services on board throughout the voyage and have rendered them voluntarily and without compulsion so far as appears, I think they must still be considered members of the steamer's crew within the meaning of the treaty. They may have been free, so far as our laws are concerned, to claim wages at a rate higher than the contract rate (a claim which they do not make), or they may have had the right, notwithstanding their contract, to refuse service and leave the vessel after having gone on board (a right which they have never asserted), and the penalties may have been incurred which are imposed by clause f of section 24, above referred to; but, having once completed the voyage as members of the steamer's crew, I think that a difference arising in reference to the amount of wages to be paid them at the end of the voyage is still a difference within the treaty provisions. When the "crew" of a vessel is referred to, those persons are naturally and primarily meant who are on board her aiding in her navigation, without reference to the nature of the arrangement under which they are on board. "It matters not whether the contract is verbal or in writing or for a long or short voyage or period." The Marie (D. C.) 49 Fed. 286, 287. As used in a treaty, the word must be given its natural and obvious meaning, in preference to a meaning derived by construction from the laws of one only of the contracting nations. In Commonwealth v. Bartlett, 190 Mass. 148, 76 N. E. 607, already referred to above, it was held that no person not under a binding engagement for a term of service to continue for some time in the future was a "member of the crew," within the meaning of Rev. Laws Mass. c. 66, § 2. It is made an offense by that statute to entice or persuade a member of the crew to leave the vessel before the expiration of his term of service, and the defendant was indicted for that offense. In determining the meaning of "member of the crew" for the purposes of that case, it

is obvious that a different rule of construction was required from that which is appropriate here.

Section 24 of the act of 1898 is subsequent to the treaty, and might, of course, had Congress so intended, have modified the treaty provisions. No such intent, however, can be presumed. It must be clear from the language of the act. When a treaty and a legislative act relate to the same subject, "the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either." Whitney v. Robertson, 124 U. S. 190, 194, 8 Sup. Ct. 456, 31 L. Ed. 386. "It will not be presumed that the legislative department of the government will lightly pass laws which are in conflict with the treaties of the country." The Chinese Exclusion Case, 130 U. S. 581, 600, 9 Sup. Ct. 623, 32 L. Ed. 1068. Clause f of section 24 expressly declares that the section is to apply to foreign vessels only so far as treaties in force do not conflict. The application of the section for which the libelants contend seems to me to involve a conflict with the treaty, and a conflict which does not appear to have been intended by Congress. The manifest purpose of the treaty is to secure to each nation the privilege of having its own laws govern questions of wages arising where its own vessels are concerned, in ports of the other nation. When, therefore, a provision is adopted into our own law of wages, and is declared by Congress applicable to foreign vessels provided that no treaty conflicts, the intention manifested is, in my opinion, not to make that provision applicable, where its application would require the assumption of jurisdiction by our courts in cases already excluded from their jurisdiction by a treaty, but to restrict its application, so far as vessels of that nation are concerned, to cases which are left by the treaty within the jurisdiction of our courts.

If the treaty obliges our courts not to take jurisdiction of differences in reference to wages where German vessels are concerned, it equally obliges the German courts not to interfere, in such cases, where vessels of the United States are concerned. The latter obligation is one upon which the United States insists. U. S. Consular Regulations 1896 (the latest edition), par. 88, p. 34; paragraphs 308, 309, pp. 118, 119. See Tellefsen v. Fee, above cited, 168 Mass. 188, 191, 192, 46 N. E. 562, 45 L. R. A. 481, 60 Am. St. Rep. 379. The same privilege is secured to the United States which it has conceded to the German Empire. Even, therefore, if it be assumed, although the case presented requires no such conclusion, that the determination of these claims for wages by the German Consul will result in a deduction of advance payments forbidden by our law in the settlement, the court is none the less forbidden by the treaty to interfere. A German court might with equal right interfere in a similar case occurring in a German port where a vessel of the United States was concerned, in order to enforce such a deduction, lest the United States Consul acting under our law might decline to make it in a settlement before him. A fair and faithful observance of the treaty stipulations would plainly forbid such interference by a German court, and equally forbids this court to take jurisdiction of the present case.

In The Troop and in The Alnwick, above referred to there was no treaty to be considered. The Neck (D. C.) 138 Fed. 114, also above referred to, deals with the treaty now under consideration, and is the only case which affords any authority for the contention that its provisions, or similar provisions in any treaty, are not to control upon the question of jurisdiction, if section 24 has been violated by the payment of advance wages. The libelant in that case was a citizen of the United States, a fact which in the opinion of the court gave him a right to invoke the jurisdiction of the courts of the United States of which no treaty could deprive him. These libelants can claim no such right. Other differences between the facts of that case and the facts here have been already referred to. If the decision is nevertheless in conflict, in any manner, with the conclusion here reached. I must, with due respect for its authority, decline to follow it.

The libel is to be dismissed, with costs.