## THE RINDJANI.

### ADAM et al. v. GRIEP et al.

(Circuit Court of Appeals, Ninth Circuit. January 6, 1919.)

No. 3128.

TREATIES ⬡=11—PROVISIONS—JURISDICTION—CLAIMS OF FOREIGN SEAMEN.
    Under Convention. between United States and the Netherlands May 23, 1878, art. 11, providing that the consular authorities of each nation shall have charge of controversies between masters and crews of vessels of their respective countries "to the exclusion of all local authorities," a court of admiralty of the United States, while given jurisdiction of suits for wages by Rev. St. § 4530, as amended by Seamen's Act March 4, 1915, § 4 (Comp. St. § 8322), is without jurisdiction of claims of Dutch seamen, who had left a Dutch vessel, for cost of transportation to Holland.

Appeal from the District Court of the United States for the First Division of the Northern District of California; Frank H. Rudkin, Judge.

Suit in admiralty by Cornelius Griep and others against the Dutch steamship Rindjani; William Adam, master, claimant. Decree for libelants, and claimant and others appeal. Modified.

The libelants and intervening libelants, 17 in number, shipping in Holland on the Dutch steamship Rindjani, filed their libel for wages, alleging that under shipping articles signed at Rotterdam January 12, 1917, they shipped for a voyage to Batavia and return to Holland; that after sailing to Batavia, the master, in breach of the contract and without their consent, proceeded to San Francisco, where they demanded to be paid off and furnished with transportation back to Rotterdam, which demand being refused they demanded payment for one-half their then earned wages since the commencement of the voyage; and that in consequence of the refusal of both demands they as matter of law became entitled to the payment of all of their earned wages. Each asked for an award specifically covering the wages claimed, and prayed for the issuance of a monition, etc., and for a decree for the payment of the alleged wages due, with interest and costs, and that the ship be condemned and sold to pay the same, and that the respective libelants have such other and further relief as they were entitled to receive, including the surrender of passports, "and the issuing of proper certificates of discharge to each of said libelants, and transportation to said Rotterdam, or the equivalent thereof."

The interlocutory decree adjudged both the libelants and intervening libelants entitled to recover the balance of wages due them, as fixed by the shipping articles, "together with wages during the period necessarily employed in returning to the Netherlands, and the cost of transportation thither" —the case being referred to a commissioner to make the necessary computations from the then record and such further proofs as might be taken to enable him to ascertain the respective amounts.

The proctor for the libelants having, by stipulation, waived all claims for wages accruing subsequent to the filing of the respective libels, the commissioner found that 9 of the libelants had been overpaid in the aggregate amount of $62.60, and that the aggregate amount of wages still due 7 of the remaining libelants was $89.45, and that the amount of the cost for transportation of the 17 men from San Francisco to Rotterdam was $159.50 each. The amount of wages claimed by all of the libelants aggregated $1,040.20. The judgment in favor of the libelants was in the aggregate amount of $2,738.-35, made up of the award of $2,711.50 representing the equivalent of the cost of their transportation from San Francisco to Rotterdam, and $26.85,

⬡=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
    254 F.—58

the aggregate amount of the unpaid wages, being the difference between the amount of the wages unpaid and the overpayments.

E. B. McClanahan and S. H. Derby, both of San Francisco, Cal., for appellants.

F. R. Wall, of San Francisco, Cal., for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). It is undisputed that the court below had jurisdiction over the claims of the libelants respecting their wages by virtue of the last proviso of section 4530 of the Revised Statutes, as amended by the Seamen's Act of March 4, 1915 (38 Stat. pt. 1, p. 1165 [Comp. St. § 8322]), which proviso reads:

"That this section shall apply to seamen on foreign vessels while in harbors of the United States, and the courts of the United States shall be open to such seamen for its enforcement."

It is strenuously contended, however, for the appellants, that as regards the claim for the transportation of the libelants from San Francisco to Rotterdam, embracing $2,711.50 of the total amount of the judgment, the court was, in the first place, without jurisdiction, and that to that extent the judgment should be reversed, and the case remanded to the court below, with directions to dismiss all of the libels in so far as they concern such transportation; and secondly, that, even conceding jurisdiction in the court, the case shows that all of the libelants secured other employment at San Francisco on other vessels shortly after leaving the Rindjani, and were, therefore, not entitled to transportation back to Rotterdam.

The shipping articles in question provide for:

"One voyage (or journey) from Rotterdam to Java, and thence to such other places as the master * * * shall decide, thence to return to a port in the Netherlands."

The case shows that at the time the articles were signed the voyage contemplated by all concerned was from Rotterdam to Batavia and way places, and thence back to the Netherlands. But before the ship arrived at Batavia, certain Dutch ships were torpedoed by German submarines, and upon reaching Batavia the master was instructed to go to San Francisco by way of Singapore, Hongkong, Nagasaki, Yokohama, and Honolulu, and from San Francisco back to Java.

Respecting the question of jurisdiction, it appears that the contract was made in Holland, was to be performed on a Dutch vessel, and that all of the parties to the action are Dutch. Apart from the contention of the appellants that by the Dutch law the construction of the shipping articles is a matter over which the consul general of the Netherlands is given exclusive jurisdiction, it is insisted that by treaty between this country and the Netherlands the decision of the questions arising under the contract was vested in the consul general. If so, it is, of course, needless to inquire into the provisions of the Dutch law.

In so far as the right of the libelants to transportation from San

Francisco to Rotterdam is concerned, it is based on their claim that the voyage to San Francisco constituted a clear breach of the contract of shipment which entitled them to discharge at the latter city. It is practically conceded that the first objection made by any of the libelants to that voyage occurred after the ship left Honolulu for San Francisco, and that after various talks between the captain of the ship and the men it was agreed that the right of the question should be submitted to and determined by the consul general of the Netherlands at San Francisco when the ship should reach that port; and so it was. We extract from the testimony of that officer as follows:

"Q. Will you now tell briefly of the meeting which you had at your office on that Saturday morning between the crew and the master of the Rindjani? * * * A. Well, at that meeting I followed the usual procedure by stating first to the captain and to the members of the crew that I did not represent the owners, neither did I represent the captain nor the members of the crew, but that I acted entirely in an impartial capacity, and if there was a dispute between the members of the crew and the captain, and they both desired to submit it to me, I would be willing to act as judge under the laws of the Netherlands, to sit as judge and if possible adjust their differences, to which they all agreed.

"Q. What was then done or said? * * * A. Well, I told the boys to take plenty of time and state all their grievances and tell me why they desired to break their contract with the captain, and several spoke, sometimes at the same time, and sometimes there were one or two who acted more or less by agreement as the spokesmen, and I inquired whether or not they had any cause for dissatisfaction on account of the food that was being furnished, and on account of the treatment received from the officers; but the boys declared themselves entirely satisfied as to that, and then I also inquired whether or not they were dissatisfied with the wages they received, and they said, 'No,' they were not, they were satisfied with the wages which they obtained, and then I inquired whether or not it was a fact that they desired to have American wages and were dissatisfied with Dutch wages. They said, 'No;' on the contrary, they had been paid a great deal more than had been agreed upon, as presents or a bonus. Then I wanted to know under those circumstances why they wanted to desert the ship, and they said they were afraid, they were afraid of being torpedoed, and I asked them if that was the only cause and they said, 'Yes;' and I remember then saying that it was almost unbelievable that Hollanders, who had been seafaring people for centuries back, would desert their flag while the English and French sailors took their chances on the places infested by submarines, while they were purposely placed on a safe run. But they stuck to their story and simply said they were afraid they would be torpedoed on account of the ship carrying articles which Germany has declared contraband, and under those conditions they did not care what was going to be paid or how it was going to be paid; they wanted to leave the ship.

"Q. What was the final result of that conference? * * * A. Well, at that time the final result was that I told them, as long as they had submitted their differences to the consul, that I could not accept that excuse for breaking their contract, and it was therefore my judgment that they were bound to stand by the ship and their captain.

"Q. Do you know whether, Mr. Torchiana, there was any subsequent action taken by these members of the Rindjani crew? A. Well, I know that afterwards the ship was libeled.

"Q. Do you know whether they left the ship or not? A. Yes— Oh, yes; they left the ship against the decision I gave, and then the captain declared them deserters, and articles of desertion were made up and forwarded to the Netherlands' authority in the home country.

"Q. Were those articles prepared in your office? A. Yes.

"Q. Who forwarded them to the home government? * * * A. They were forwarded through the consular mail to the Netherlands.

"Q. Have you a copy of the notifications of desertion or whatever you call the document? A. I have a memorandum of that, the office memorandum.
"Q. Is it a permanent record of your office? A. Yes."

The convention between the United States and the Netherlands of May 23, 1878 (21 Stat. 662), provided in its article 11 as follows:

"Consuls general, vice consuls general, consuls, vice consuls and consular agents shall have charge of the internal order on board of the merchant vessels of their nation, to the exclusion of all local authorities. They shall take cognizance of all disputes and determine all differences which may have arisen at sea, or which may arise in port, between the captains, officers, and crews, including disputes concerning wages and the execution of contracts reciprocally entered into. The courts or other authorities of either country shall on no account interfere in such disputes unless such differences on board ship be of a nature to disturb the public peace on shore or in port, or unless persons other than the officers and crew are parties thereto.

"The consuls general, vice consuls general, consuls, vice consuls and consular agents shall be at liberty to go, either in person or by proxy, on board vessels of their nation admitted to entry, and to examine the officers and crews, to examine the ships' papers, to receive declarations concerning their voyage, their destination and the incidents of the voyage; also to draw up manifests and lists of freight or other documents, to facilitate the entry and clearance of their vessels, and finally to accompany the said officers or crews before the judicial or administrative authorities of the country to assist them as their interpreters or agents."

In its sixteenth article it provided that the convention should remain in force for five years from the date of the exchange of ratifications (July 31, 1879), and further provided that:

"In case neither of the contracting parties shall have given notice twelve months before the expiration of the said period, of its desire to terminate this convention, it shall remain in force for one year longer, and so on from year to year, until the expiration of a year from the day on which one of the parties shall have given such notice for its termination."

So far as appears, that treaty had not been abrogated, but was in force, at the time the consul general of the Netherlands passed upon the controversy between the present libelants and the captain of the Rindjani, since no provision of the Seamen's Act of March 4, 1915, already referred to, has any bearing on the point now under discussion.

The provisions of article 11 of the convention, above set out, are in effect the same as those of article 10 of the treaty between the United States and the King of Prussia of May 1, 1828 (8 Stat. 382), which was the subject of consideration in The Elwine Kreplin, 9 Blatchf. 438, Fed. Cas. No. 4,426, in which case it was held that that treaty required that the matter then in dispute—a matter of wages in that case—was one for the determination of the consular officer, and that the United States courts had no jurisdiction of it.

That ruling was followed by Judge Deady in the case of The Marie (D. C.) 49 Fed. 286, in the case of The Burchard (D. C.) 42 Fed. 608, in The Welhaven (D. C.) 55 Fed. 80, and in other cases there cited.

Our conclusion is that the court below had no jurisdiction over the question as to the right of the libelants to transportation from San Francisco to Rotterdam, and that it is therefore unnecessary to consider whether, if it had such jurisdiction, the libelants would be en-

titled to the cost thereof in view of their securing other employment on other vessels so soon after leaving the Rindjani.

It results that the case must be and is remanded to the court below, with directions to so modify the judgment as to deny the cost of transportation of any of the libelants or intervening libelants from San Francisco to Rotterdam, for lack of jurisdiction over that subject.